AO 91 (Rev. 11/82)

# CRIMINAL COMPLAINT

FILED
CLERK, U.S. DISTRICT COURT

JAN 19 2014

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br>ARMANDO ALVAREZ-CISNEROS and<br>JUAN AGUILAR-COTA | DOCKET NO. |
|---|---|
| | MAGISTRATE'S CASE NO.<br>**14-0118M** |

Complaint for violation of Title 46, United States Code, Section 70503(a)(1)

| NAME OF MAGISTRATE JUDGE<br>HONORABLE ALICIA ROSENBERG | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE<br>January 18, 2014 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

### [46 U.S.C. §70503(a)(1)]

On or about January 18, 2014, defendants ARMANDO ALVAREZ-CISNEROS and JUAN AGUILAR-COTA knowingly and intentionally possessed with the intent to distribute marijuana, a Schedule I controlled substance, on board a vessel subject to the jurisdiction of the United States, in violation of Title 46, United States Code, Section 70503(a)(1), and thereafter entered the United States in Los Angeles County, in the Central District of California.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>**DIANNE KELLY**<br><br>OFFICIAL TITLE<br>Task Force Officer, Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations |
|---|---|

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE[1]<br>**ALICIA G. ROSENBERG** | DATE<br>January 19, 2014 |
|---|---|

[1] See Federal Rules of Criminal Procedure 3 and 54

AUSA Diana M. Kwok x6529      REC: Detention

## A F F I D A V I T

I, Dianne Kelly, declare as follows:

### I.  INTRODUCTION

1.   I am a Detective with the Los Angeles Port Police
Department, and have been so employed for seven years.   In
addition to my basic law enforcement training, I have
approximately four years of experience as an investigator.   My
investigative experience includes investigating crimes such as
burglaries, thefts, narcotics trafficking, and other property
crimes and crimes against persons within the City of Los
Angeles.   I have also received 40 hours of specific narcotics
training for the Los Angeles Sheriff's Academy on such topics as
evidence of use, possession, influence, packaging,
transportation, and sales of controlled substances.

2.   For the past year, I have served as a Task Force
Officer with the United States Department of Homeland Security,
Immigration and Customs Enforcement, Homeland Security
Investigations, Border Enforcement Security Taskforce under the
Office of the Special Agent in Charge, Los Angeles ("LA BEST").
LA BEST is a taskforce aimed at identifying, targeting, and
eliminating vulnerabilities to the security of the United
States, including, but not limited to, the Los Angeles/Long
Beach Seaport Complex and the surrounding transportation and
maritime corridors.

1

3.     In addition to the training outlined above, in July 2012, I received training on customs law, including violations of Title 19 of the United States Code, from the Department of Homeland Security ("DHS") and Immigration Customs Enforcement ("ICE"), and I am currently cross-designated as a United States Customs Officer. I also have spoken at length with more experienced officers and detectives regarding the use, possession, influence, packaging, transportation, and sales of controlled substances. Throughout my career, I have participated in numerous narcotics related arrests, including arrests for the illegal use, influence, possession, and possession for sale of marijuana, cocaine, methamphetamine, heroin and other narcotics. I have also served search warrants that have resulted in the recovery of narcotics evidence.

4.     Based on my training and experience, I am aware that narcotics smuggling operations in Southern California, including operations to smuggle marijuana into the United States by boat, typically operate as follows:

a.     Narcotics smugglers who intend to bring narcotics into the United States illegally bring such narcotics to areas near the United States-Mexico border. Narcotics smugglers will often bring narcotics into the United States using a small, open-bowed fishing vessel with a distinct appearance, commonly known as a "panga."

2

b.   The laws of the United States require that people entering or importing goods into the United States present themselves and their goods for inspection at official United States Customs and Border Protection ports of entry or United States Border Patrol checkpoints.  Narcotics smugglers do not present themselves or their smuggled narcotics for inspection. Instead, narcotics smugglers often conceal narcotics within their vessels in order to circumvent the above-mentioned ports of entry and checkpoints.  To assist their navigation of the United States coastline, narcotics smugglers typically use Global Positioning System ("GPS") units.

c.   After surreptitiously crossing the United States-Mexico border by vessel, narcotics smugglers typically travel to predetermined areas where the narcotics are unloaded from the boat and loaded into waiting vehicles called "load vehicles." Narcotics smugglers will often contact accomplices onshore who will inform them exactly where to direct the boat to meet the waiting "load vehicles."  As a general matter, narcotics smugglers communicate frequently with one another, primarily through the use of cellular telephones.  Once the narcotics are unloaded into "load vehicles," they are typically transported to locations known as "stash houses," where the illegally imported narcotics are parceled off to a narcotics dealer or dealers.

3

Many such "stash houses" have been located in the Inland Empire and the greater Los Angeles, California area.

## II.  PURPOSE OF AFFIDAVIT

5.  This affidavit is made in support of a criminal complaint against ARMANDO ALVAREZ-CISNEROS ("ALVAREZ") and JUAN AGUILAR-COTA ("AGUILAR") for possessing with intent to distribute marijuana, a Schedule I controlled substance, on board a vessel subject to the jurisdiction of the United States, in violation of Title 46, United States Code, Section 70503(a).

6.  I make this affidavit based on personal knowledge derived from my participation in this investigation and information I have learned from the following sources:

a.  oral and written reports about this and other investigations that I have received from agents and officers of Immigration and Customs Enforcement ("ICE"), the United States Border Patrol ("USBP"), and other federal and local law enforcement agencies; and

b.  the following law enforcement databases: California Law Enforcement Telecommunication System ("CLETS"), National Crime Information Center ("NCIC"), and Treasury Enforcement Communications System ("TECS").

7.  Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by a DHS officer or another law enforcement officer who had

4

either direct or hearsay knowledge of the statement, to whom I
have spoken, or whose report I have reviewed.

8.    This affidavit is made solely for the limited purpose
of establishing probable cause for a criminal complaint and does
not, therefore, attempt to set forth all information that may
have been learned by all law enforcement personnel involved in
the subject investigation, which remains ongoing.

### III.    STATUTORY AND REGULATORY BACKGROUND

9.    Title 46, United States Code, Section 70503(a)(1)
provides: "An individual may not knowingly or intentionally
manufacture or distribute, or possess with intent to manufacture
or distribute, a controlled substance on board a vessel of the
United States or a vessel subject to the jurisdiction of the
United States."

10.    Title 46, United States Code, Section 70502(c)(1)
defines "vessel subject to the jurisdiction of the United
States" with a non-exclusive list.  Subsection (F) includes "a
vessel in the contiguous zone of the United States . . . that is
a hovering vessel as defined in . . . 19 U.S.C. § 1401."  Under
19 U.S.C. § 1401, a hovering vessel is defined as "any vessel
which is found or kept off the coast of the United States within
or without the customs waters, if, from the history, conduct,
character, or location of the vessel, it is reasonable to
believe that such vessel is being used or may be used to

5

introduce or promote or facilitate the introduction or attempted
introduction of merchandise into the United States in violation
of the laws respecting revenue."

IV. **STATEMENT OF PROBABLE CAUSE**

11. Based on my review of written statements from Officer
of the Deck Julianna Harvin and Randall D. Reese of the crew of
the United States Coast Guard ("USCG") Cutter Steadfast ("USCG
Cutter Steadfast"), I know the following:

a. In the early morning of January 18, 2014, USCG
Cutter Steadfast was patrolling south of San Nicholas Island and
detected a target of interest ("TOI") on its radar. When the
TOI saw the USCG Cutter Steadfast, it completely stopped and
went dead in the water ("DIW"). The TOI then changed direction
and headed north at approximately 30 knots. When the crew of
the USCG Cutter Steadfast launched their small boat, they were
able to determine that the TOI was a panga.

12. Based on the written statement of Boarding Officer
Sarah Jane Sapiano from the crew of the USCG Cutter Aspen small
boat, I know the following:

a. USCG Cutter Aspen was also patrolling in the area
at the time and launched its small boat to assist.

b. When USCG Cutter Aspen small boat gained a visual
on the panga, the panga went DIW upon detection. Boarding
Officer Sapiano saw that the panga was white with gray trim and

6

baby blue interior, approximately 30 feet long, with two
outboard engines, and had an appearance similar to many panga-
style vessels commonly used for smuggling drugs into Southern
California.

      c.   When the USCG Cutter Aspen small boat came
alongside the panga, Boarding Officer Sapiano and Petty Officer
Erin Doege observed two occupants, approximately 10 drums of
fuel, and numerous brown, rectangular bales partially covered by
a brown blanket.  The two occupants were later identified as
AGUILAR and ALVAREZ.

      d.   Once the USCG determined that the panga was
located 18 nautical miles off Santa Rosa Island, within the
contiguous zone of the United States, Boarding Officer Sapiano
embarked the panga.  After embarking the panga at approximately
0419 hours, Boarding Officer Sapiano opened a random bale and
found a green leafy substance inside.  Boarding Officer Sapiano
put the green leafy substance into a Narcotics Identification
Kit test, and the substance tested positive for marijuana.
Boarding Officer Sapiano then tested a second sample from the
same bale; the second sample also tested positive for marijuana.
The Aspen Cutter boarding team then seized the 122 bales of
contraband on board the panga and detained AGUILAR and ALVAREZ.

    13.  Based on my conversations with the crew of the USCG
Cutter Narwhal, I know the following:

    a.   USCG Cutter Narwhal arrived on scene at approximately 1553 hours and took possession of the panga, the contraband, and AGUILAR and ALVAREZ.

    b.   USCG Cutter Narwhal then transferred the panga, the contraband, and AGUILAR and ALVAREZ to the Coast Guard Sector Los Angeles/Long Beach base in San Pedro, to LA BEST for processing.

    c.   On January 18, 2014, at approximately 2350 hours, the panga, the contraband, ALVAREZ AND AGUILAR were turned over to LA BEST.

  14.  Based on my review of a written statement from Department of Homeland Security -- Homeland Security Investigations ("DHS-HSI") Special Agent Ben McArthur, I know that at the Coast Guard Sector Los Angeles/Long Beach base, LA BEST offloaded approximately 90 large bales and 32 smaller bales from the panga. The bales appeared to be wrapped in brown packing tape, over either cellophane or tin foil. Each of the bales was cut open and appeared to contain a green, leafy substance. Together, the 122 bales weighed approximately 1150 kilograms. When DHS-HSI Special Agent Ben McArthur field-tested samples of the substance contained in the bales, the field test results were positive for the presence of marijuana.

15.   On January 19, 2014, at approximately 0010 hours, ALVAREZ AND AGUILAR were taken to the LA BEST office to be interviewed.

### A.   AGUILAR'S STATEMENTS TO LAW ENFORCEMENT

16.   Based on my conversations with Border Patrol Agent ("BPA") Dany Mancilla, I know the following:

a.   At approximately 0107 hours, BPA Mancilla interviewed AGUILAR in the Spanish language.  The interview was witnessed by HSI Special Agent ("SA") Stephen Sabot.

b.   BPA Mancilla advised AGUILAR of his Miranda Rights in the Spanish language at approximately 0114 hours. AGUILAR stated that he understood his rights and agreed to speak to the Agents without the presence of an attorney.  No threats or promises were conveyed to him.

c.   When AGUILAR was advised of his right to speak with a Mexican Consular Official, AGUILAR stated that he wished to speak with such an Official.  At 0304 hours, BPA Julian Velardes called the Mexican Consulate and left a detailed message on their voicemail on behalf of AGUILAR.

d.   During the interview, AGUILAR admitted the following:

i.   The panga had illegally entered into the United States with a load of marijuana.

9

ii.     AGUILAR is a citizen and national of Mexico present in the United States without any immigration documents allowing him to be or remain in the United States legally. AGUILAR was born on July 9, 1986, in San Carlos, Baja California, Mexico.  Both of AGUILAR's parents are citizens and nationals of Mexico.

iii.    AGUILAR was the person in charge of keeping the panga boat fueled.  ALVAREZ had the GPS and was the captain of the panga; he was in control of the trip.

iv.     AGUILAR was living and working as a diver in Guerrero Negro, Mexico.  A friend known as "El Chino" had loaned him 12,000 pesos.  When AGUILAR was unable to repay the 12,000 pesos, he was asked to make a trip north to the United States with contraband in a boat as payback for the loan.  AGUILAR did not initially accept the job, but "El Chino" threatened him for not accepting the job, since AGUILAR still owed "El Chino" money.  "El Chino" told AGUILAR that he would forgive AGUILAR's debt and give AGUILAR extra money on top of the money that he owed if AGUILAR smuggled the marijuana for him.  AGUILAR had worked for "El Chino" as a contractor for approximately two months before he was approached to smuggle marijuana.  AGUILAR stated that he did not own the panga; he believed the panga belonged to "El Chino".

10

v.     AGUILAR knew ALVAREZ from San Carlos; they were neighbors.  They left from Guerrero Negro three days ago at nightfall; the boat was loaded with gas and marijuana when they left.  AGUILAR and ALVAREZ were given also life vests and clothes.

vi.     AGUILAR and ALVAREZ both knew what they were getting into when they agreed to smuggle marijuana into the United States.  "El Chino" had explained the rules -- what to do and how to do it -- to him and ALVAREZ, and had given them the coordinates on the GPS to go north and get refueled before proceeding to the unloading point.

vii.     When AGUILAR and ALVAREZ reached the GPS coordinates where they were to get gas, another panga boat was there to meet them, with two people on board who gave them gas. AGUILAR and ALVAREZ then proceeded to the open seas where they remained for a day.  Afterward, they proceeded north until they were spotted and followed by a plane and then intercepted by two Coast Guard vessels.

viii.     AGUILAR and ALVAREZ were going to go to the final point on the GPS, unload the narcotics, and then return to Mexico.  AGUILAR stated that ALVAREZ had a satellite phone, but was not going to use it.

ix.     AGUILAR stated that people would be waiting for them on shore to retrieve the marijuana, but that he did not

11

know who those people were. AGUILAR did not want to do the job and was "almost, almost" threatened if he did not take the job.

**B. ALVAREZ'S STATEMENTS TO LAW ENFORCEMENT**

17. Based on my conversations with BPA Andres Briseno, I know the following:

a. On January 19, 2014, at approximately 0036 hours, BPA Briseno interviewed ALVAREZ in the Spanish language. The interview was witnessed by BPA Alvaro Rodriguez.

b. BPA Briseno advised ALVAREZ of his Miranda rights in the Spanish language, as witnessed by BPA Rodriguez. ALVAREZ stated that he understood his rights and agreed to speak to the Agents without the presence of an attorney. No threats or promises were conveyed to him.

c. When ALVAREZ was advised of his right to speak with a Mexican Consular Official, ALVAREZ stated that he wished to speak to such an Official. BPA Julian Velardes called the Mexican Consulate on ALVAREZ's behalf at 0304 hours, and left a detailed message on the consulate voicemail system with ALVAREZ's information and a location where he could be reached for a consular interview.

d. During the interview, ALVAREZ admitted the following:

i. ALVAREZ is a citizen and national of Mexico, present in the United States without any immigration documents

12

allowing him to be or remain in the United States legally. ALVAREZ was born on May 29, 1963, in Baja California Sur, Mexico.  Both of his parents are citizens and nationals of Mexico.

      ii.    ALVAREZ was the captain of the panga that he and AGUILAR were using to illegally enter the United States with a load of marijuana.

      iii.    ALVAREZ makes a living as a fisherman and scuba diver in San Carlos, Baja California Sur, Mexico.  While working as a clam diver in Mexico, ALVAREZ was approached by three subjects that he described as "smugglers," who offered him a job to smuggle marijuana into the United States.  The primary smuggler, "Chino," offered ALVAREZ $50,000 USD to smuggle marijuana into the United States by boat.  The second smuggler was known as "Apache".  ALVAREZ claimed that he did not know the third smuggler's name.  ALVAREZ only made the smuggling arrangements with "Chino".

      iv.    "Chino" initially paid ALVAREZ $30,000 Mexican pesos to be used for him and AGUILAR to travel to Guerrero Negro, where they boarded the panga.  ALVAREZ's son drove him and AGUILAR to Guerrero Negro in ALVAREZ's personal vehicle.  When ALVAREZ and AGUILAR arrived in Guerrero Negro, Baja California, Mexico, approximately six people were loading the panga with the marijuana.

v.     ALVAREZ was in charge of the GPS, radio and satellite phone during the trip.  AGUILAR was in charge of changing the fuel cans during the trip.

vi.     ALVAREZ did not own the panga on which they were arrested; he believes it was owned by "Chino".  The agreement between ALVAREZ and "Chino" was for ALVAREZ to smuggle the marijuana into the United States and then return to Mexico with the panga.  "Chino" supplied ALVAREZ with a radio, a satellite phone, and a GPS with the coordinates already programmed into it to allow ALVAREZ to locate where to off-load the marijuana in the United States.  ALVAREZ claimed that he took the job offer because "Chino" told him that "it would be a shame if something bad would happen" to his son.

vii.     ALVAREZ admitted that he knew he was smuggling marijuana and told the BPAs that before crossing into United States waters, he met with another panga near Erendira, Mexico, to obtain enough fuel to complete the trip.

viii.     Prior to being arrested by the Coast Guard, ALVAREZ and AGUILAR attempted to flee and throw the bales of marijuana into the ocean, but ALVAREZ realized that he "may as well get arrested" because if he returned to Mexico without the marijuana, he feared the smugglers would kill him.  Shortly before he was arrested, ALVAREZ saw the Coast Guard vessels' lights and heard the sirens, so he stopped the panga.

14

e.    When asked if he had anything else to say, ALVAREZ told Agents, "I knew I came here to fail." ALVAREZ further stated that he was embarrassed to be in this situation and added that if he goes back to Mexico, "they" are going to kill him.

## CONCLUSION

18.    Based upon the foregoing facts and my training and experience, there is probable cause to believe that ALVAREZ and AGUILAR have violated Title 46, United States Code, Section 70503(a), by possessing marijuana, a Schedule I controlled substance, with the intent to distribute, on board a vessel subject to the jurisdiction of the United States.

_____
Dianne Kelly
Task Force Officer,
Department of Homeland Security,
Immigration and Customs Enforcement,
Homeland Security Investigations

Sworn to and subscribed before me this 19th day of January, 2014.

### ALICIA G. ROSENBERG
_____
UNITED STATES MAGISTRATE JUDGE

15



FINDING RE PROBABLE CAUSE

On January 19, 2014, at ___6:31___ a.m. (p.m.), Task Force Officer Dianne Kelly of the Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations, appeared before me regarding the probable cause arrest of defendants ARMANDO ALVAREZ-CISNEROS and JUAN AGUILAR-COTA, occurring on a vessel approximately 18 nautical miles off the coast of Santa Rosa Island, some time between 4:19 a.m. and 5:00 a.m., on January 18, 2014, in the Central District of California.

Having reviewed the agent's statement of probable cause, a copy of which is attached hereto, the Court finds that there **exists/does not exist** probable cause to arrest the defendant(s) for a violation of Title 46, United States Code, Section 70503(a).

/ ✓ / It is ordered that defendants ARMANDO ALVAREZ-CISNEROS and JUAN AGUILAR-COTA be held to answer for proceedings under Federal Rule of Criminal Procedure 5 / 40 on Tuesday, Jan. 21, 2014. at 2:00 pm

/___/ It is ordered that defendants ARMANDO ALVAREZ-CISNEROS and JUAN AGUILAR-COTA be discharged from custody on this charge forthwith.

DATED: Jan. 19, 2014, at 6:31 a.m. (p.m.)

**ALICIA G. ROSENBERG**

_____
HON. ALICIA G. ROSENBERG
UNITED STATES MAGISTRATE JUDGE